# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

PATRICIA MACINTOSH

|  |  |  |  |
|---|---|---|---|

Plaintiff,

v

GRAND TRAVERSE COUNTY
COMMISSIONER RON CLOUS,
in his Individual Capacity, and
GRAND TRAVERSE COUNTY

Defendants.

_____/

CASE No.: 1:21-cv-309
HON.

JURY TRIAL DEMANDED

| |
|---|
| Blake K. Ringsmuth   (P44013)<br>Thomas J. Wuori       (P41096)<br>RINGSMUTHWUORI PLLC<br>Attorneys for Plaintiff<br>102 W. Front Street, Ste. 401<br>Traverse City, MI 49684<br>(231) 929-4700<br>(231) 929-4702 (Fax)<br>blake@rwinjurylaw.com<br>kate@rwinjurylaw.com |

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, PATRICIA MACINTOSH, by and through her attorneys, RingsmuthWuori, PLLC, and for her Complaint and Jury Demand against Defendants, GRAND TRAVERSE COUNTY COMMISSIONER RON CLOUS ("CLOUS") and GRAND TRAVERSE COUNTY, states as follows:

Plaintiff, a citizen of the United States of America, attended her County Board of Commissioners' meeting to exercise her constitutional rights. The same rights all citizens are guaranteed under the First Amendment to the United States Constitution: to petition her government for the

redress of her grievances and engage in free speech. That day, in response to the insurrection at the nation's Capitol and the attempted kidnapping, trial and murder of Michigan's Governor by armed criminals, Plaintiff simply asked for her local government to make a statement rejecting the violent and threatening behavior of known violent groups involved in the destabilization of our democratic society, such as the "Proud Boys." In response, and instead of rejecting the violence and threat to democracy, the Defendant Commissioner briefly left the virtual meeting and returned with a high powered semi-automatic weapon brandishing it at Plaintiff and others. The foreseeable result was to inflict fear and emotional trauma on Plaintiff and other citizens that might seek to petition their county government. As a direct result of exercising her constitutional rights and the Commissioner's menacing response, Plaintiff has received multiple threatening communications and fears for her life. Plaintiff also seeks a preliminary and permanent injunction against Defendants to prevent any further infringement of the public's First Amendment rights, and damages against the individual Defendant as set forth below.

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff, Patricia MacIntosh, is a 74-year-old single woman and resident of Grand Traverse County, State of Michigan.

2.      Defendant Ron Clous ("Commissioner Clous" or "Clous") is an elected Grand Traverse County Commissioner, residing in Grand Traverse County, Michigan. At all times relevant, Commissioner Clous was acting under color of law in his individual capacity as an elected county commissioner.

3.      Defendant Grand Traverse County is a municipal corporation under the laws of the State of Michigan.

4.      The events giving rise to this Complaint took place in Grand Traverse County, Michigan.

5.      This action is brought pursuant to the First Amendment to the United States Constitution and 42 USC § 1983, as applied to these Defendants through the Fourteenth Amendment to the United States Constitution, and jurisdiction is proper in this Court pursuant to 28 USC § 1331.

6.      Injunctive relief is sought pursuant to 28 USC § 2201 and FRCP 57 and 65 and the general legal and equitable powers of this Court.

7.      Venue is proper in this Court pursuant to 28 USC § 1391(b).

## COMMON ALLEGATIONS

8.      Plaintiff incorporates by reference the allegations set forth in paragraph 1 through 7 above, and all subsequent allegations, as if fully set forth herein.

9.      The "Proud Boys" is a widely known extremist group advocating, inciting, and committing violence in furtherance of their bigoted beliefs. They have been described as, among other things: i) an "extremist group" by the Federal Bureau of Investigation as of 2018, ii) a "hate group" by the Southern Poverty Law Center, and iii) a "terrorist group" by the Canadian government. For instance, Proud Boys members organized and attended the white supremacy rally held in Charlottesville, VA in 2017, where one woman was killed. Since that time Proud Boys members have been indicted for their role in the January 6, 2021, violent insurrection at the nation's Capitol.

10.     On or about March 4, 2020, at the Grand Traverse County Board of Commissioners meeting at least two members of the Proud Boys were welcomed by certain members of the County Commission, including Defendant Clous, to speak in favor of a resolution designating the county

as a "Second Amendment Sanctuary." (See **Exhibit A,** Photo). At least one of them was openly carrying a firearm.

11.     Ultimately, Defendant Clous and the Board Chairman voted consistently with the Proud Boys' wishes, and later publicly praised them.

12.     Defendant Clous' and other Commissioners' praise of the Proud Boys was very upsetting to Plaintiff and many others in light of their known violence and bigotry.

13.     On or about May 1, 2020, numerous militia group members and others from throughout the State of Michigan, including northern Michigan, descended on the State's Capitol displaying assault and other weapons in an effort to intimidate and coerce the Legislature and Governor regarding their opposition to the State's COVID-19 safety policies. These individuals were made up, at least in part, upon information and belief, of Proud Boy members.

14.     On or about October 8, 2020, multiple members of a violent group plotted and planned to kidnap, "try", convict and execute the State's Governor for her perceived misconduct. This criminal conspiracy was to be carried out in northern Michigan roughly 25 miles from Plaintiff's home.

15.      On or about January 6, 2021, an insurrection was mounted by a violent mob in Washington D.C. in an effort to overturn the Presidential election results. Five people were killed in the insurrection and multiple others were grievously injured.

16.     The members of this violent mob included members of the Proud Boys (since indicted for their crimes) among other extremist and hate group members. Their violent conduct threatened the very underpinnings of our democracy and constitutional government.

17.     Fourteen days after that violent insurrection, and after the Proud Boys' role in it was widely publicized, the Grand Traverse County Board of Commissioners held a public meeting

on January 20, 2021. During the public comment portion of the meeting, Plaintiff and at least one other spoke out critically against the Board's welcoming of the Proud Boys back at its March 4, 2020, meeting. Plaintiff was compelled to speak on this matter given the group's obvious ties to white supremacy and other hateful and violent actions, not the least of which was their well-publicized criminal role in the violent insurrection at our nation's capital.

18.     At all times relevant for the County Board of Commissioners' meetings described herein, Plaintiff and the public had a right to make public comment pursuant to the laws of the State of Michigan, including the Open Meetings Act, MCL 15.263(5).

19.     Prior to the January 20, 2021, County Board of Commissioners' meeting Plaintiff was a regular contributor often exercising her right to make public comments in an effort to have input into her local government's decisions.

20.     At that January 20, 2021, meeting, just prior to Plaintiff making public comment to her County Commission, another citizen specifically criticized the Board of Commissioners regarding the Proud Boys' involvement at the earlier meeting. The citizen pointed out the Proud Boys' historically known link to violence and its labeling as a "hate" group as well as a "terrorist organization." The citizen asked the Commissioners to publicly state they do not belong to such a vile group.

21.     This citizen's public comments to the Commissioners were the exercise of her right to seek redress from her government and engage in free speech as guaranteed by the First Amendment to the United States Constitution.

22.     In response to that citizen's exercise of her First Amendment right, the Board Chairman, who is closely aligned with Defendant Clous, retaliated and publicly chastised her and defended the Proud Boys stating that "I do know a few Proud Boys" and that the citizen was stating

"misinformation" about them. He closed his lecture to her by telling her that her opinions/political speech were not welcome in the public meeting and to save them for her "magazines and your editorials."

23.    It is very uncommon at these County meetings that a Commissioner responds to public comment rather than just listening.

24.    In response to the Board Chair's aggressive outburst at the citizen for her public comment/ political speech, and implicitly acknowledging the chilling effect such an aggressive rebuke might have, another Commissioner questioned the Chair's actions stating, "Is it appropriate to be commenting on public comments in this manner?"

25.    In response to his fellow Commissioner's questioning of him, and still during the public comment period of the meeting, the Board Chairman was clearly angry and accused the citizen of "spreading lies," thus defaming her, upon information and belief.

26.    Plaintiff was the next citizen to offer public comment at the meeting. She began her remarks noting how the prior speaker had been retaliated against by the Board Chair including his defense of the Proud Boys. Plaintiff too was critical of the Commission's apparent support of the Proud Boys and the tacit endorsement she felt it gave to other hate groups that would use violence as a means to their ends as had recently happened.

27.    As part of her public comments, Plaintiff specifically referenced the occupation of the State's Capitol building by people with assault rifles, those that plotted the kidnapping and murder of the Governor and the violent insurrection in Washington D.C. by Proud Boys members and others.

28.     As Plaintiff was closing her remarks, she asked the Commission to "please make some sort of a public statement for the community that you do not accept the behaviors" of those violent groups.

29.     In response to Plaintiff's heartfelt petition to make a "public statement" disavowing such violent acts, and after his ability to fully deliberate over his actions, Defendant Clous got up and left the meeting for a few seconds.

30.     Plaintiff noticed Defendant Clous leave the meeting while she was speaking and then return displaying something in front of the camera so she could see it.

31.     Before Plaintiff finished her public comment asking for the Commissioners' denunciation of violence, she realized that Defendant Clous was brandishing his high-powered rifle as his "public statement" to her. (See **Exhibit B,** "Still" image from Video). Additionally, the video of his actions also shows Defendant Clous' menacing smirk while brandishing his weapon.

32.     Defendant Clous' retaliation against Plaintiff was an escalation of the Chairman's retaliation against the prior caller's criticism of the Commission and the Proud Boys, where the Chairman told the citizen her opinions and statements (an exercise of her right to free speech) on that topic were not welcome and that she was a liar.

33.     Defendant Clous' brandishing of the deadly weapon left no doubt that neither her, nor any other, criticism of the Commissioners' support of the Proud Boys would be tolerated; a symbolic message to say "stop or else."

34.     Defendant Clous' decisions and actions of brandishing a deadly weapon in retaliation to Plaintiff's public comment evidences a malicious intent if not a reckless and/or callous disregard of Plaintiff's Constitutional rights.

35.     In response to Defendant Clous' threatening behavior the Board Chairman can be seen laughing at Defendant Clous' actions. Later the Chairman said he thought that it was "ironic" that in response to Plaintiff's request to denounce the violence Defendant Clous went and got a gun. (See Report of Board Chairman's comments, at **Exhibit C**).

36.     Plaintiff's public comments to the County Commission at the January 20, 2021, meeting was the exercise of her right to seek redress from her government and engage in free speech as guaranteed by the First Amendment to the United States Constitution.

37.     Shortly after the January 20, 2021, meeting Defendant Clous admitted that his aforementioned actions were in response to Plaintiff's public comment and defended the Proud Boys as "the most respected folks" that spoke at the March 4, 2020, public meeting and that "they were decent guys and treated us with respect," according to published reports. (See **Exhibit C**).

38.     Defendant Clous' aforementioned admission regarding his positive feelings about the Proud Boys is further evidence and motive of his malicious intent toward Plaintiff due to her criticism of his favored group and his support of it.

39.     Defendant Clous' brandishing of his weapon under these circumstances was shocking and outrageous in a civilized society. Further it was in retaliation for Plaintiff's exercise of her Constitutionally guaranteed right to petition her government for redress as well as free speech under the First Amendment to the United States Constitution.

40.     The brandishing of a deadly high-powered rifle at a public meeting in response to Plaintiff's exercise of free speech is a harm to Plaintiff unto itself as codified under Michigan law. See MCL 750.234e. It implies the risk of grievous bodily harm or death if the unwanted conduct continues.

41.     As a direct and proximate result of Defendant's brandishing a high-powered rifle at her in retaliation for the exercise of her First Amendment rights, Plaintiff felt fearful, intimidated, and physically threatened, which continues today.

42.     The impact of Defendant's retaliatory conduct on Plaintiff, including her fearfulness and concern for her safety, has in actuality deterred her from exercising her First Amendment rights including in subsequent public governmental meetings.

43.     As just one example, there have been at least two County Board of Commissioners meetings where Defendant Clous' misconduct toward Plaintiff was specifically on the agenda and the topic of over 100 public comments. Due to Defendant's retaliation Plaintiff was deterred from participating as she would normally have.

44.     In response to Defendant Clous' physically threatening and intimidating conduct, and as proof that Plaintiff's fears were and are reasonable and that she is "of ordinary firmness" in this regard, there has been tremendous public outcry against his outrageous and threatening act and calls for his resignation. In fact, a letter calling for his resignation was circulated and has gained more than 1,530 signatures from the community as of this filing. (See Letter at **Exhibit D**).

45.     The aforementioned letter included the signatures of the entire Traverse City City Commission, all elected officials.

46.     For further proof of the objective reasonableness of Plaintiff's fear, intimidation, and deterrence from exercising her First Amendment rights is the January 28, 2021, Grand Traverse County Board of Commissioners "special meeting" to address Defendant Clous' brandishing of the weapon.

47.     At that "special meeting" public comment took more than 4 hours and involved approximately 100 people making comments. The great majority expressed shock, fear, and anger at the Defendant's use of the weapon in response to Plaintiff's comments.

48.     During that January 28, 2021, public meeting more than one citizen stated that they were afraid to give their name due to Defendant's prior threatening behavior toward Plaintiff, while even more simply refused to do so despite being asked for their name. How many others refused to participate at all due to the retaliation is unknown.

49.     In response to Defendant Clous' brandishing of the firearm, another County Commissioner proposed a resolution to censure Defendant Clous for his actions, but that resolution was voted down.

50.     Additionally, the local newspaper wrote an editorial calling Defendant Clous' behavior "an affront to our democratic process." It characterized it as conduct that would, "intimidate [Plaintiff], discourage her from speaking freely in a petition to her government to redress a grievance," the very rights protected by the United States Constitution. (See Op Ed piece, at **Exhibit E).**

51.     Due to Defendant Clous' physically threatening and intimidating retaliation toward Plaintiff with his high-powered rifle, Plaintiff felt compelled to make a police report for her protection.

52.     The brandishing of his high-powered rifle in a public meeting, not surprisingly, is a crime under Michigan law. See MCL 750.234e.

53.     Foreseeably, and as a direct and proximate result of Defendant Clous' actions,

Plaintiff received multiple threatening anonymous communications, some after midnight, such that she contacted the police. As Plaintiff is a 74-year-old woman living alone, these threatening calls are particularly terrifying.

54.     As a direct and proximate result of Defendant's intimidating and physically threatening adverse actions and retaliation Plaintiff has suffered emotional injury that has also manifested in physical symptoms including insomnia, migraine headache, nightmares, heart palpitations, nausea, weight loss, and tremors, among others.

55.     As a direct and proximate result of Defendant's intimidating and physically threatening adverse actions and retaliation Plaintiff has been deterred and chilled from exercising her First Amendment rights.

56.     Moreover, other members of the public have been deterred and chilled from exercising their First Amendment rights due to Defendant Clous' illegal and outrageous retaliation.

57.     Plaintiff was and is a person of ordinary firmness in all respects. Her aforementioned injuries and deterrence from exercising her First Amendment rights are the same as any other person of ordinary firmness would experience under such intimidating and physically threatening conduct.

58.     After the January 20, 2021, meeting the Chairman of the Grand Traverse County Board of Commissioners publicly stated that Defendant Clous did "nothing wrong" regarding his brandishing of the high-powered rifle and that it was not illegal, among other things.

59.     At the aforementioned "special meeting" on January 28, 2021, and then at other times, other Grand Traverse County Board of Commissioners opined that there was nothing improper about what Defendant Clous did.

60.     While two County Commission resolutions were put forward to clearly state that a Commissioner's display of a high-powered rifle, or any gun for that matter, in response to public comment is inappropriate and not allowed, the resolutions have failed. Currently no policy banning a Commissioner's brandishing or displaying of a weapon in response to public comment has been adopted by the Defendant Commission; to the contrary it has been characterized as not "wrong" or "improper."

61.     Furthermore, Defendant County representatives and Commissioners have stated that Defendant Clous' conduct did not violate any of the County's rules.

62.     Given the Grand Traverse County Board of Commissioners' actually voting down the censure of Defendant Clous, in addition to the Commissioners' comments stating that there was nothing wrong with such brandishing, Defendant County has effectively adopted a policy or practice of allowing such retaliatory and threatening conduct.

63.     The Defendant County's aforementioned policy or practice of allowing the brandishing of weapons in retaliation against public comment violates the First Amendment to the United States Constitution and effectively amounts to a prior restraint on freedom of speech and impairing the right to petition the government for a redress of grievances.

64.     Pursuant to clearly established First Amendment jurisprudence, the loss of First Amendment freedoms, for even a short period of time, constitutes irreparable harm sufficient to warrant injunctive relief.

## COUNT I- VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

65.     Plaintiff incorporates by reference the allegations set forth in paragraph 1 through 64 above, and all subsequent allegations, as if fully set forth herein.

66.     At all times relevant Defendant Clous was acting in his individual capacity as an elected member of the Grand Traverse County Board of Commissioners and Vice Chair of that Board.

67.     At all times relevant, Defendant Clous was acting under color of state law.

68.     On January 20, 2021, at a public meeting of the Board of County Commissioners Plaintiff was engaged in the act of free speech and petitioning her local government for a redress of her grievances as was her protected right under the First Amendment to the United States Constitution and 42 USC § 1983.

69.     Specifically, Plaintiff was requesting her local government to, "please make some sort of a public statement for the community that you do not accept the behaviors" of violent groups such as the ones that mounted the violent insurrection at our nation's capital.

70.     It is a well settled, fundamental and cherished right of every citizen to petition and/or criticize their government. The creation of these precious rights through our Constitution's Bill of Rights and their enforcement through our courts sets the United States of America apart from every other country in the world.

71.     The very idea of a government, republican in form, implies a right on the part of its citizens to petition for a redress of a grievances and is among the most precious of liberties safeguarded by the Bill of Rights.

72.     Public officials, such as Defendant, cannot feel free to wield the powers of their office as weapons against those who question their decisions, for if and when they do, as here including brandishing an actual weapon, they do damage not merely to the citizen in their sights but also to the First Amendment liberties and the promise of equal treatment essential to the continuity of our democratic enterprise.

73.     The right of Plaintiff to be free from the Defendant's retaliation for the exercise of her First Amendment rights is well known and has been clearly established law such that any reasonable government official would have known what he was doing was a violation of law as of the time Defendant acted and therefore the Defendant is not entitled to qualified immunity.

74.     Here, immediately following the Board Chair castigating a citizen in retaliation for similar criticism, the Defendant deliberately, intentionally, and in direct response to the exercise and content of the Plaintiff's petition for redress, escalated that retaliation when he went to obtain a high-powered rifle while the Plaintiff was still speaking. He then brandished his weapon at her with one obvious and deadly unspoken threat: do not exercise your right to redress or else.

75.     When asked how the public might view the Defendant's actions toward Plaintiff with the rifle, the Board Chairman put words to Defendant's unspoken and menacing threat to her: "If you are going to start trouble, don't start it here."

76.     Defendant Clous' Constitutional violations were intentional, malicious or done recklessly with callous disregard for Plaintiff's rights.

77.     Defendant Clous' brandishing a high-powered rifle in response to Plaintiff's exercise of her Constitutional rights was a serious adverse action of retaliation against Plaintiff implicitly and expressly threatening grievous physical harm and an extremely intimidating act taken due to her exercise of free speech as well as its content criticizing the Defendant.

78.     Defendant Clous' adverse action of retaliation was capable of deterring a person of ordinary firmness from exercising their First Amendment rights, as further supported by the overwhelming public outcry against Defendant Clous, including many who were frightened themselves to even give their names at the public meeting.

79.     Defendant's adverse retaliatory action has a chilling effect on citizens' Constitutional rights and has foreseeably chilled and deterred Plaintiff, and others, from exercising their First Amendment rights.

80.     Defendant's adverse retaliatory action toward Plaintiff was deliberate with time for reflection before acting, was shocking and repugnant to our system of government and the United States Constitution and a violation of her Constitutional rights.

81.     In fact, Defendant's adverse retaliatory action has deterred and chilled Plaintiff's exercise of her Constitutional rights as alleged previously, among other things. Plaintiff has historically been active in the Board of County Commissioners' meetings, exercising her right to free speech but has not done so since being threatened by Defendant Clous.

82.     As a direct and proximate result of the Defendant Clous' Constitutional violations, Plaintiff has suffered injury which continues, including emotional injury, as hereinbefore alleged.

83.     As a result of Defendant's intentional, malicious and/or reckless Constitutional violations, Defendant Clous is subject to punitive damages as allowed by law.

84.     As a result of Defendant's Constitutional violations, Defendant Clous is liable to pay Plaintiff's reasonable attorney's fees and costs pursuant to 42 USC 1988.

### COUNT II - INJUNCTIVE RELIEF FOR UNCONSTITUTIONAL POLICY OR PRACTICE

85.     Plaintiff incorporates by reference the allegations set forth in paragraph 1 through 84 above, and all subsequent allegations, as if fully set forth herein.

86.     Defendant County's and Clous' policy or practice of allowing and engaging in the brandishing of a weapon in response to the lawful exercise of the Plaintiff's and the public's First Amendment rights is a violation of the United States Constitution, acts as a prescriptive chilling

of free speech and illegally impairs our citizens' rights to petition their government for a redress of their grievances.

87.     Defendant County's and Clous' ongoing Constitutional violation has directly and proximately caused Plaintiff and the public irreparable harm that continues unabated.

88.     Furthermore, Defendant Clous' and County's failure to acknowledge or recant this illegal retaliation and policy, and makes future violations more likely without this Court enjoining their unconstitutional conduct.

89.     As such Plaintiff is entitled to immediate declaratory and injunctive relief suspending and ultimately prohibiting Defendant County's and Clous' ongoing Constitutional violations in addition to nominal damages.

WHEREFORE, Plaintiff prays for judgment and declaratory relief against Defendants as follows:

a.     For all of her damages, including compensatory and punitive damages as allowed by law, against Defendant Clous;

b.     To declare that Defendant County's policy or practice of allowing the brandishing of a weapon in retaliation for the exercise of Plaintiff's and the public's First Amendment rights violates the United States Constitution and ordering the policy and/or practice to stop;

c.     To preliminarily and permanently enjoin Defendant County's and Clous' aforementioned unconstitutional policy or practice and award Plaintiff nominal damages for the ongoing and past Constitutional violations;

d.     To award Plaintiff her reasonable attorneys fees, costs and expenses pursuant to 42 USC § 1988; and

e.      To grant Plaintiff such other relief as this Court should find just and proper.


                                                **RINGSMUTHWUORI, PLLC**

Dated: April 12, 2021                           By: _____
                                                Blake K. Ringsmuth (P44013)
                                                Attorneys for Plaintiff


### JURY DEMAND

Plaintiff PATRICIA MACINTOSH, by and through her attorneys, RINGSMUTHWUORI

PLLC, demands a trial by jury in the above-captioned matter.


                                                **RINGSMUTHWUORI, PLLC**

Dated: April 12, 2021                           By: _____
                                                Blake K. Ringsmuth (P44013)
                                                Attorneys for Plaintiff